No. 40,147

Robert J. and Philomene Muntzel, *Appellees*, v. State Commission of Revenue and Taxation, *Appellant*.

(298 P. 2d 272)

Opinion filed June 9, 1956.

*Paul Hurd*, of Topeka, argued the cause, and *Dean Burkhead*, of Topeka, was with him on the briefs for the appellant.

*John R. Keach*, of Mission, argued the cause, and *Roy W. Cliborn*, of Mission, was with him on the briefs for the appellees.

The opinion of the court was delivered by

Parker, J.: This is an appeal from a judgment of the district court of Johnson County vacating and setting aside an order of the State Commission of Revenue and Taxation, hereinafter referred to as the appellant, wherein the appellant had sustained an additional assessment of income tax liability, and interest thereon, made by its Director of Revenue against Robert J. and Philomene Muntzel, hereinafter referred to as the appellees, for the calendar years 1947 to 1952, inclusive.

The cause was determined in the court below without evidence other than a stipulation of facts and the contract of purchase on

which appellant based its additional tax assessment. Therefore, since these instruments contain all factual information essential to a proper understanding of the single appellate issue involved, they will be quoted *in toto* or referred to at length.

So far as pertinent the facts, as stipulated by the parties preceding the trial, read:

"On December 6, 1946, the taxpayers entered into a contract in writing under the names of R. J. Muntzel and Philomene Muntzel with Muntzel-Benson-Marsh Nut Company, a Kansas corporation, for the purpose [purchase] of a wholesale and retail nut meat business located at Mission, Kansas, of which they were sole owners. A copy of said contract is attached hereto, marked Exhibit 'A' and made a part hereof and was introduced in evidence herein and accepted as appellant's Exhibit 'A.'

"The sale of the business pursuant to the contract was completed, income was received under the contract, and taxes paid thereon in the years 1947, 1948, 1949, 1950, 1951 and 1952. On November 20, 1953, the State Commission of Revenue and Taxation notified the taxpayers of an assessment for the years 1947 through 1952, inclusive, except 1950, said notice of assessment being as follows:

" 'The Commission of Revenue and Taxation recently held a hearing in the matter of the Muntzel-Benson-Marsh Nut Co. regarding the taxability of payments from the company to you, and has ruled that these payments are royalties and not for the purchase of a capital asset: Therefore they are deductible as expense on the books of the corporation, and to you are ordinary gain and fully taxable rather than gain from the sale of capital assets and only 50% recognized as taxable, as you have claimed in all years from 1947 to 1952, inclusive, except 1950 when they were shown as fully taxable.

" 'Our assessment of February 29, 1952, has been held in abeyance pending a hearing on this appeal of the corporation and now that it has been settled we must ask that you accept the responsibility for payment. As other years are now involved, a statement covering the years 1950, 1951 and 1952 has been prepared. Your liability therefore is as follows:

" 'Previous assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $402.78
Assessment for 1950-51-52 . . . . . . . . . . . . . . . . . . . . . . . . . 209.66
_____
$612.44

" 'Kindly forward remittance for this amount within thirty (30) days.'

"Upon hearing before the State Commission of Revenue and Taxation held May 4, 1954, the taxpayers contended that the contract was a contract to sell, that the assets had been held more than six months and that the proceeds of the sale thereof were properly treated as capital gains. A copy of the proceedings has been introduced in evidence and accepted as appellee's Exhibit 1. At the conclusion of the hearing the State Commission of Revenue and Taxation made its finding confirming the assessment from which order appeal has been taken to this court.

"In January, 1947, the taxpayers assigned to the corporation all of their

interest in the trade-mark registered as No. 262666 dated October 2, 1929 and during all of the time in question the corporation occupied the premises owned by the taxpayers paying therefor the sum of $125.00 per month rent. The taxpayer was given one share of stock in the corporation as a qualifying share but has never had any other interest or ownership in the corporation or any official connection therewith.

"Copies of the taxpayer's returns for the years in question are attached hereto marked Exhibits 3, 4, 5, 6 7, 8 and 9."

The Exhibits referred to in the last paragraph of the stipulation are not required for disposition of the involved issue and for that reason will not be reproduced or hereafter mentioned.

In substance, after identifying R. J. and Philomene Muntzel as first parties and Muntzel-Benson-Marsh Nut Company, a Kansas corporation, as second party, material provisions of the contract, dated December 6, 1946, on which the rights of the parties must stand or fall and which will be referred to subsequently by paragraphs numbered as they appear in that instrument, are as follows:

1 and 2. First parties have been engaged in the wholesale and retail nut meats business under the name of R. J. Muntzel Pecan Company and second party is a Kansas corporation.

3. First parties agree to turn over to second party all the physical assets and inventory owned and used by them in connection with the operation of the aforesaid business for which second party agrees to pay the cost price of the inventory of salable merchandise on hand not to exceed $30,000.

4, 5 and 6. First parties agree that after the date of the contract they will refrain from engaging directly or indirectly in the nut business for a period of twenty-five years; will co-operate with second party in giving advice and aid in carrying on such business and meet upon request with officers of second party at least once a month to give it the benefit of such advice and counsel as they may desire; and will assist second party in the purchasing of merchandise, particularly nuts, necessary and incidental to the continued operation of the business.

7 and 8. First parties, as the owners thereof, agree to rent the premises previously occupied in carrying on the business to second party at a monthly rental of $125.00 per month; and license second party to use their registered trade-mark, "Muntzel Cell-O-Pakt," during the life of the contract, and perpetually thereafter if the total purchase price "hereinafter set forth" is paid.

9. Second party agrees to take over the going business, good will,

trade-marks and, as far as possible, to continue the operation of the business upon the long established trade policy.

10 and 11. Second party agrees to pay first parties a royalty on all sales business transacted by it on a percentage basis (describing it); the minimum total royalty to be $3,000 per annum.

12. When total royalty payments reach $50,000 such payments shall cease and the total business and its assets shall become the absolute business of the second party, who shall be forever released from any further obligation to pay further royalties, except that after payment of $50,000 the total business and its assets shall become the absolute business of second party subject to an obligation to pay Muntzels 1½% on city sales and 1% on all other sales so long as either shall live.

13. Upon default in the faithful performance of the contract first party shall have the right to cancel the contract and take over the business by paying the cost inventory price of merchandise on hand, plus the reasonable value of other assets, such value to be determined by arbitration.

14. Second party is to carry fire, tornado and product liability insurance on all merchandise owned by it, such insurance to be payable to second party; the purpose thereof is to keep second party solvent for the benefit of first parties.

15. Second party is to keep a competent accountant and maintain a system of bookkeeping reflecting all business transacted by it, such records to be open for inspection by first parties at all reasonable times.

16. Royalties provided for shall be payable on the 15th day of each month.

17. In the event of the death of either of first parties this contract shall continue so long as the other continues to live, but not after total royalties of $50,000 have been paid except that the 1½% agreed on shall continue to be paid as long as either party shall live; the death of both of first parties automatically releases any further obligations upon second party to pay royalty to anyone, including their estate, their heirs or assigns except for a sum representing the difference between $25,000 and the amount theretofore paid them; which sum shall be paid to their estate, or their heirs, assigns, or devisees, as the case may be; when the last mentioned sum is fully paid second party shall be the absolute owner of the business, free and clear of all claims whatsoever and the contract shall be treated

as fully cancelled in all respects; if as much as $25,000 has been paid to first parties during their lifetime and prior to the death of both, then in that event, second party has no further obligation to pay any further amount whatsoever, under the contract, and said business, and its assets, shall become the absolute property of second party free and clear of any and all claims whatsoever; upon the completed payment of $50,000 no further minimum royalty shall be required, nor shall any minimum royalty be required in event of the death of both first parties pending the final payments provided in this paragraph; in the event of serious depression minimum royalty shall be reduced from $3,000 to $2,000.

18. This contract shall be construed as a contract of purchase subject to the conditions and terms herein set out until the amounts herein provided for are paid, at which time the contract shall be construed to be a completed sale of vesting absolute title to said business in second party.

19, 20 and 21. Business of established routes will not be sold or assigned during the life of the contract; weights and prices will follow the formula of six years past with permission to second party to increase prices up to 8% in the event of increased costs; second party shall not sell any established business in any territory.

23. In the event Arthur Benson and Carl Marsh (conceded to be the owners of all but qualifying shares of stock in the corporation) shall die or both become incapacitated, then after $50,000 in royalties has been paid by second party, there shall be no obligations to pay first parties the 1½% and 1% royalties otherwise payable, after five years from date of any sale of the business by second party; this provision shall not alter other terms of the contract and is inserted for the purpose of aiding second party to dispose of its investment after payment of $50,000 in royalties in the event said individuals connected with second party shall die or become incapacitated.

Upon presentation of the cause as previously stated and after arguments by counsel for the respective parties the trial court returned the following conclusions of law:

"1. This court has jurisdiction of the subject matter of this proceeding under G. S. 1949, 74-2426, and also has jurisdiction of the parties hereto.

"2. The contract herein, considered in its entirety, is a contract of sale and should be construed as such.

"3. The payments of 'royalties' as provided for in said contract constitute payments on the purchase price of a capital asset and therefore should be treated as capital gains under the provisions of G. S. 1949, 79-3216.

"4. The order of the State Commission of Revenue and Taxation of the State of Kansas rendered on August 30, 1954, is erroneous and should be vacated and set aside, and judgment entered for R. J. Muntzel and Philomene Muntzel against the State Commission of Revenue and Taxation of the State of Kansas in the sum of $639.45 and costs."

Following action as above indicated the trial court rendered judgment against the appellant in the sum of $639.45 and costs in accord with its conclusion of law No. 4 and further decreed that pursuant to the provisions of G. S. 1949, 79-3231(c) such judgment should bear interest at the rate of one-half of one per cent per month from October 1, 1954 (the approximate date on which appellees paid the involved additional tax assessment under protest). Thereupon appellant perfected the instant appeal.

The problem presented by the appeal will be simplified by stating at the outset that no one involved in this case, not even the appellant, contends that the judgment rendered by the trial court is erroneous if the involved contract is to be construed as a contract of sale and the payments of royalties therein provided for constitute payments on the purchase price of the business in question.

Notwithstanding the stipulation of the parties, wherein it is recognized that the corporation and appellees entered into a contract for the purchase of the business in question and that the sale of that business was completed pursuant to that contract, appellant contends that the language thereof is so indefinite and uncertain that this court is called upon to interpret its terms and determine whether, at the time such contract was entered into, the parties thereto considered the royalty payments therein provided for as constituting payments of the purchase price (conceded to be capital gains) or regarded them as ordinary income. Consistent with its action in making the additional assessment of tax liability against appellees the appellant of necessity takes the position the contracting parties contemplated such payments were to be regarded as trade-mark license and personal service payments to the appellees and therefore should be treated as ordinary income, not as payments on the sale of capital assets.

We do not feel called upon to here detail and discuss the numerous arguments advanced by industrious counsel for appellant respecting the force and effect to be given isolated provisions of the contract in question. Nor do we deem it necessary to labor conclusions it reaches from an analysis of the contract on that basis. Noting, as appellant contends, that the issue involved presents a matter of first impression before this court and assuming, without deciding,

the contract is so indefinite and uncertain as to require an interpretation of its terms our duty is to survey such instrument in its entirety, including each and all of its provisions, and then determine what the parties had in mind on the basis of their intention at the time of its execution. When that is done, looking through form to substance, we have no difficulty whatsoever in concluding, particularly in view of the heretofore mentioned provisions of paragraphs 3, 7, 8, 9, 12, 13, 14, 17, 18 and 23 and notwithstanding arguments advanced by appellant to the contrary which have all been reviewed and carefully considered, that in executing the agreement the parties intended to and did enter into and consummate a contract for the outright sale of the business which contemplated that the royalties therein specified were to be regarded as payments on the purchase price of such business, not as trade-mark license and personal service payments in the nature of income. Assuming *arguendo*, although we do not subscribe to the assumption, that theretofore there might have been some doubt regarding the construction the parties themselves placed upon the contract we think all doubt with respect thereto was done away with by them when, in January 1947, as the parties stipulate and agree, appellees assigned all their right, title and interest in the trade-mark involved in the contract to the corporation.

With the contract construed as above indicated it necessarily follows the trial court's conclusions of law Nos. 2 and 3, heretofore quoted, were proper. Therefore its judgment must be affirmed.

It is so ordered.